## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 0:21-CV-61493-RUIZ/STRAUSS

RYAN TURIZO,
individually, and on behalf of all
others similarly situated,

      Plaintiff,

vs.

DOCTOR'S ASSOCIATES LLC,

      Defendant.

_____/

## DEFENDANT SUBWAY FRANCHISEE ADVERTISING FUND TRUST LTD.'S MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendant Subway Franchisee Advertising Fund Trust Ltd. ( "Subway"), pursuant to Fed. R. Civ. Proc. 12(b)(6), moves to dismiss the Second Amended Complaint [D.E. 16] ("SAC"). First, plaintiff cannot state a claim under the Telephone Consumer Protection Act ("TCPA") for an alleged violation of the federal Do-Not-Call ("DNC") regulation, 47 C.F.R. § 64.1200(c)(2), because the implementing provision under 47 U.S.C. § 227(c) applies only to "residential" phone numbers, not cellular numbers. Second, plaintiff's claim under the Florida Telephone Solicitation Act, Fla. Stat. § 501.059, as amended by Senate Bill No. 1120 ("FTSA"), is barred by the Supreme Court's decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), or, if plaintiff is correct that it is intended to be broader in coverage than the federal law, it is void under the dormant Commerce Clause because it burdens interstate commerce and regulates wholly interstate activities.

## I.  Plaintiff Cannot State a Claim under 47 U.S.C. § 227(c) because the Alleged Text Messages were not Calls Made to a "Residential" Telephone

Plaintiff purports to bring a putative class action over alleged text messages sent to his phone number that he allegedly did not consent to,[1] nor opted out of by replying with "Stop" (as instructed by the texts). SAC ¶¶ 11, 31. The sole claim under the TCPA is based on the allegation that plaintiff registered his cell phone number on the national DNC registry. *Id.* ¶ 16. But the TCPA expressly states that the protections afforded under subsection 227(c) apply to "residential telephone subscribers," not cellular phone subscribers. *See* 47 U.S.C. § 227(c). The restriction against calls made to phone numbers on the DNC registry does not extend to cell phone numbers.

---

[1] While not alleged in the SAC, the texting platform at issue is only capable of sending text message to phone numbers that have affirmatively opted in by sending a verification text from the mobile phone number. Plaintiff's allegations suggest that his phone number was reassigned to him from the previous subscriber of the number who had provided affirmative consent by opting in to receive Subway® coupons by text message to this number.

Calls to *cellular* phone numbers are governed by a different provision of the TCPA that restricts the use of automated calls. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting calls made using an automatic telephone dialing system ("autodialer") or an artificial or prerecorded voice to phone numbers assigned to a "cellular telephone service"). Plaintiff does not and cannot assert a claim under 47 U.S.C. § 227(b) following the U.S. Supreme Court's decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), construing *autodialer* to **exclude** systems that merely dial phone numbers stored in a database (which is what plaintiff alleges, SAC ¶ 27), and held "Congress' definition of autodialer requires that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator" (which plaintiff does not and cannot allege). *Id.* at 1170-72 (rejecting a broad interpretation of autodialer in view of the "narrow statutory design" reflected in the statute's plain language). Plaintiff equally cannot sue under 47 U.S.C. § 227(c) for alleged calls made to his cell phone number because the statute, by its express terms, applies to residential (not cellular) phone subscribers only.

The limited scope of § 227(c) is evidenced by the statutory framework and text. Both the U.S. Supreme Court and the Eleventh Circuit Court of Appeals have recognized that the TCPA distinguishes between "residential" and "cellular" phone lines in different prohibitions of the statute. The terms are not used interchangeably. This is made obvious by the presence of separate provisions that restrict calls made using "an artificial or prerecorded voice" to *cellular* phone lines in 47 U.S.C. § 227(b)(1)(A)(iii) and to *residential telephone lines* in § 227(b)(1)(B). As the Supreme Court explained in *Duguid*, the TCPA "separately prohibits calls using 'an artificial or prerecorded voice' to various type of phone lines, including home phones and cell phones," making clear that the TCPA treats *residential* phone lines as distinct from *cellular* phone lines.

2

141 S. Ct. at 1172. The Eleventh Circuit also found that the TCPA draws a distinction between calls to residential phone lines and calls to cellular numbers. *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014) (distinguishing calls made to a "residential telephone line" as set forth under 47 U.S.C. § 227(b)(1)(B) from calls made to a "cell-phone number"); *see also Cunningham v. Carribean Cruise Lines, Inc.*, No. 15-62580-CIV-MORENO, 2016 WL 7494871, at *2 (S.D. Fla. Dec. 29, 2016) ("While Plaintiff argues that his cellular phone serves as both a mobile and residential line, the Eleventh Circuit distinguishes residential land line telephone numbers from cell-phone numbers."); *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1320-21 (S.D. Fla. 2012) (explaining that "the TCPA's residential calls prohibition is contained within a separate subsection from the cellular calls prohibition," *comparing* 47 U.S.C. § 227(b)(1)(A)(iii) *with* § 227(b)(1)(B), where "[t]he different provisions also provide different exemptions" and finding the distinction reflected in "[p]ractical realities support a distinction between residential and cellular lines") *aff'd on other grounds*, 755 F.3d 1265 (11th Cir. 2014).

Plaintiff cannot assert a claim under 47 U.S.C. § 227(c) based on alleged text messages sent to his cellular phone number because both the statute and the implementing regulation under 47 C.F.R. § 64.1200(c) restrict calls made to a *residential telephone subscriber*, and does not include calls to a cellular phone subscriber.[2] The omission was deliberate in light of the TCPA's

---

[2] The DNC provision set forth in 47 C.F.R. § 64.1200(c)(2) prohibits calls made to a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry . . . ." The regulation was promulgated under § 227(c) of the TCPA which directs the FCC to engage in rulemaking "concerning the need to protect *residential telephone subscribers'* privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1) (italics added). Pursuant to the FCC's authority, under § 227(c)(2), to adopt regulations "to implement methods and procedures or protecting the privacy rights described in [§ 227(c)(1)]," the Commission "may require the establishment and operation of a single national database to compile a list of telephone numbers of *residential subscribers* who object to receiving telephone

3

textual distinction between residential and cellular phones. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("A familiar principle of statutory construction ... is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."), *superseded by statute on other grounds*, Pub. L. No. 109-366, § 7, 120 Stat. 2600, 2635-36 (2006) (amending 28 U.S.C. § 2241); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'"). Plaintiff's allegation that he uses his cell phone for residential and personal purposes, SAC ¶ 18, is therefore not determinative or material because the statutory scheme and text plainly distinguishes cellular calls from residential calls. *See, e.g.*, *Cunningham*, 2016 WL 7494871, at *2 ("[T]he Court finds Plaintiff's assertion that a cellular phone can be converted into a residential phone unavailing."); *Morgan v. U.S. Xpress, Inc.*, No. 3:17-cv-00085, 2018 WL 3580775, at *2 (W.D. Va. July 25, 2018) ("Plaintiff's characterization of the cell phone as a 'residential, cellular telephone line' is not determinative of this question. These are not factual allegations, but legal terms drawn from the operative statute. . . . Congress's structural choice to treat these different types of calls differently has been observed by abundant and uniform . . . authority.").

While there is no controlling Eleventh Circuit case deciding whether 47 U.S.C. § 227(c) applies to cell phone numbers, several courts have held that it does not based on the clear language of the statute.[3] Though other courts, including one from this district, have ruled that cellular phones

---

solicitations . . . ." *Id.* § 227(c)(3) (italics added). The TCPA creates a private right of action for an alleged "violation of the regulations prescribed under this subsection . . . ." *Id.* § 227(c)(5).
[3] *See, e.g.*, *Cunningham v. Creative Edge Mktg. LLC*, No. 419CV00669ALMCAN, 2021 WL

4

may be treated as residential phones,[4] those cases do not adequately explain why they disregard the plain terms of the statute (which would not permit a claim for a text message sent to a cell phone) and typically rely on a separate rule created by the FCC expanding "residential telephone" to include "wireless" numbers for purposes of the do-not-call regulations only, not the litigation remedy. *See* 47 C.F.R. § 64.1200(e) (providing that the rules under § 64.1200(c) and (d) are applicable to "calls to wireless telephone numbers" in accordance with the FCC's Report and Order, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 18 FCC Rcd. 14014 (July 3, 2003) (hereafter "2003 FCC Order")). But invoking the FCC's rule under § 64.1200(e) to assert a private right of action would exceed the scope of § 227(c). Congress did not authorize the FCC to create a registry for wireless

---

2792353, at *4 (E.D. Tex. June 16, 2021) (ruling that "Plaintiff has not provided a sufficient basis to proceed on his claim under § 227(c)(5) of the TCPA and 47 C.F.R. § 64.1200(d)" which applies "to a residential telephone subscriber" and "does not encompass plaintiff's cell phone"), *report and recommendation adopted*, No. 4:19-CV-669, 2021 WL 3048400 (E.D. Tex. July 20, 2021); *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 362 n.7 (E.D. Pa. 2019) (concluding, without deciding the issue, that "the plain language of 'residential telephone' describes a telephone used by individuals in the home, and not a cellular telephone, which can be used anywhere. Furthermore, the TCPA specifically mentions 'cellular telephone service' in § 227(b) and § 64.1200(a)(l)(iii), indicating that both Congress and the FCC were aware of the distinction between a cellular telephone and a residential telephone and purposely protected only 'residential telephone subscribers' under § 227(c), § 64.1200(c) and (d). . . The Court, therefore, is not convinced that Congress and the FCC, through the TCPA and its regulations, intended to protect 'cellular telephone subscribers' along with 'residential telephone subscribers.'"); *Cunningham v. Spectrum Tax Relief, LLC*, No. 3:16-2283, 2017 WL 3222559, at *3 (M.D. Tenn. July 7, 2017) (ruling, based on the "plain language" of the TCPA regulation, that plaintiff cannot state a claim because "[t]he private right of action created by 47 U.S.C. § 227(c)(5) is . . . limited to redress for violations of the regulations that concern residential telephone subscribers," and plaintiff alleges only calls to his cell phone), *report and recommendation adopted*, 2017 WL 3220411, at *1 (July 28, 2018).

[4] *See, e.g.*, *Spinelli v. Storm Tight Windows*, No. 8-62592-CIV-DIMITROULEAS, 2019 U.S. Dist. LEXIS 27573, at *10-11 (S.D. Fla. Feb. 21, 2019) (ruling, without deciding the issue of whether the plain terms of 47 U.S.C. § 227(c) excludes calls made to cell phone numbers, that plaintiffs whose cell phone numbers were listed on the DNC registry had stated a claim under § 227(c)(5)).

or cellular subscribers and instead explicitly instructed the agency to establish, pursuant to the TCPA, "a single national database to compile a list of telephone numbers of *residential subscribers* who object to receiving telephone solicitations" within the privacy of their homes. *See* 47 U.S.C. § 227(c)(3) (italics added). This limitation is reflected in the implementing regulation under § 64.1200(c) which applies to only "residential telephone subscriber[s]," and does not refer to wireless or cellular subscribers. By contrast, § 64.1200(e) is not based on the express provisions of § 227(c), but rather on a broad reading of legislative intent – inconsistent with the plain terms of the statute – as the FCC explained in the 2003 FCC Order. As set forth in that ruling, the FCC expressly relied on the autodialer provision under § 227(b) (*not* the DNC provision) of the TCPA to conclude that "the national database should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA." 2003 FCC Order ¶ 33 (*citing* 47 U.S.C. § 227(b)(1)(iii) in concluding that "Congress has indicated its intent to provide significant protections under the TCPA to wireless uses"). But while the FCC may require telemarketers to comply with the DNC provisions for residential and wireless subscribers alike, it cannot create a cause of action for cell phone users where § 227(c)(3) expressly limits the private right of action to a "violation of the regulations prescribed under this subsection" (not the autodialer provision) which protects the rights of *residential* subscribers.[5] Thus, the separate rule created by the FCC to expand the scope of the DNC provisions to include wireless numbers is based on broad policy considerations not supported by the language in § 227(c), and cases relying on that rule do not persuasively explain why the FCC's broadening of liability under the TCPA

---

[5] The fact that the FCC created a separate rule under § 64.1200(e) to prohibit calls to wireless numbers on the DNC list also indicates that the FCC understood cellular lines to be distinct from residential lines, and the two are regulated differently under the TCPA.

should be enforced under the private right of action provision of § 227(c)(3).

Accordingly, because extending private civil liability under § 227(c) to include calls made to "wireless" phone numbers listed on the DNC registry would deviate from the clear language of the statute and exceed the authority granted by Congress, § 64.1200(e) is not binding on this court. *See, e.g.*, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977) ("The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law," but rather "to carry into effect the will of Congress as expressed by the statute." (internal quotations and citations omitted)). Nor should the FCC rule be afforded any deference because the statutory text is dispositive and makes clear that Congress did not intend the regulations promulgated under § 227(c) to apply to cellular subscribers. That should therefore be "the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Yet even if the FCC rule under § 64.1200(e) and 2003 FCC Order can be read to mean that the FCC interpreted *residential* subscribers to include *wireless* subscribers (despite that Congress created separate provisions under the TCPA to regulate calls to residential phones versus cell phones), the Supreme Court has said that interpretive rules by the FCC "may not be binding . . . ." *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051 (2019) (questioning whether FCC rulings in TCPA cases are binding in civil litigation, and remanding the case for a determination); *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 982 F.3d 258 (4th Cir. 2020) (holding that the relevant FCC order was interpretive, and thus not binding).

Indeed, it would be untenable that a potential plaintiff could trigger a federal claim against a third party by their own unilateral action, as there is no way for companies to know if an

individual is purporting to use a cell phone as a "residential number" and therefore no way to comply. While some courts have allowed claims like this to proceed, none have considered the argument presented here – that liability under a federal statute cannot possibly be triggered by the unarticulated intent of a plaintiff to use their mobile phone as a "residential phone." The better view is that there is no claim. *See, supra,* n.3. This is a pure issue of law—not one that needs to be fleshed out in discovery—and because this is plaintiff's third attempt to plead this claim, any further amendment would be futile.

Thus, plaintiff's TCPA claim should be dismissed with prejudice because § 227(c), by its plain terms, applies only to residential phone numbers, not cellular or wireless lines.

## II.      Plaintiff Cannot State a Claim Under the FTSA

Plaintiff's FTSA claim alleges use of a "computer software system that automatically selected and dialed" his phone number "from a list of numbers," SAC ¶¶ 21, 27, which under federal law does not give rise to a claim because the Supreme Court ruled that the TCPA's autodialer provision could not be read to prohibit systems that merely dialed phone numbers stored in a database – an impermissible construction that would subject individual smartphone users to the penalties of the TCPA. *Duguid*, 141 S. Ct. at 1170-72. But plaintiff is now asking this Court to do what the Supreme Court was unwilling to do in *Duguid*, by construing the autodialer provision of the FTSA to prohibit the use of computerized phone systems that select or dial phone numbers – a functionality present in most modern phone systems, including smartphones – to make sales calls. Fla. Stat. § 501.059(8)(a) (the "Autodialer Provision") (prohibiting any "person" from "mak[ing]" and also "knowingly allow[ing] a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers . . . without the prior express written consent of the called party"). Plaintiff's contention that the autodialer term under the FTSA

8

can be defined more broadly than the TCPA is contrary federal law and should be rejected.

First, plaintiff's broad construction of autodialer under the FTSA, as regulating interstate calls using computerized phone systems to select or dial numbers, is preempted by the TCPA because the Communications Act of 1934,[6] 47 U.S.C. § 151 *et seq.*, occupies the field with respect to any state regulation of interstate telecommunications, and the FTSA does not fall within the limited scope of the TCPA's savings clause in 47 U.S.C. § 227(f)(1).

Second, the FTSA runs afoul of the Dormant Commerce Clause on two independent grounds because the Autodialer Provision, which by its terms is not limited to *intrastate* activities, regulates calls occurring wholly outside of Florida and excessively burdens interstate communications. The FTSA violates the Dormant Commerce Clause by directly regulating extraterritorial conduct based on the statutory presumption that a sales call made to any number with a Florida area code is made to a Florida resident or to a person in Florida. *See* Fla. Stat. § 501.059(8)(d) ("the Area Code Presumption"). For example, a person in Connecticut who makes an "automated" sales call to a person located in New York with a Florida area code could facially violate the FTSA even though the call occurred wholly outside of Florida.

Further, the FTSA would unduly burden interstate commerce if the Autodialer Provision is construed in a manner inconsistent with the TCPA's autodialer term. For at least sales calls made to a cell phone number using an autodialer (which the FTSA refers to as an "automated system" but does not otherwise define the term), plaintiff's construction of the FTSA would impose greater restrictions on interstate telecommunications than what is currently allowed under federal law

---

[6] The TCPA was "[e]nacted in 1991 as part of the Federal Communications Act . . . to deal with . . . telemarketing." *Velocity Net, Inc.*, 156 F.3d 513, 514 (3d Cir. 1998), *abrogated on other grounds*, *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 376 (2012).

9

unless the FTSA's autodialer definition is tethered to the TCPA's definition as articulated in *Duguid*. Plaintiff's interpretation of an autodialer under the FTSA would effectively require callers to avoid using most modern phone systems that use computer software to dial phone numbers. This creates even more of a substantial burden on interstate commerce without conferring any greater benefits to Florida, because a broad reading of the Autodialer Provision would force businesses and telemarketers to comply with the FTSA regardless of whether calls are actually made to a person in Florida, and/or engage in extensive tracking of the whereabouts of their customers, in order to avoid substantial penalties under the FTSA's statutory damages provision.

Third, the Autodialer Provision violates both the First Amendment and the Fifth Amendment Due Process Clause. It is a content-based regulation that applies to calls made to solicit sales, and is vague in that it fails to provide notice of which conduct it permits and which it forbids, effectively chilling commercial speech by discouraging all sales calls made with an "automated system," which is not defined, and if construed inconsistent with *Duguid*'s interpretation of autodialer under the TCPA, would virtually encompass all modern phone systems.

Given the serious Supremacy Clause, Commerce Clause, and Substantive Due Process concerns raised by the broad construction of the FTSA alleged in the FAC, this Court should construe the FTSA's autodialer provision coextensively with *Duguid*'s definition of ATDS under the doctrine of constitutional avoidance. *See Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1310 (11th Cir. 2020) (ruling that "[c]onstitutional avoidance principles" support narrowly interpreting the ATDS provision, indicating the First Amendment precludes defining ATDS broadly to encompass smartphones). Alternatively, if the Court finds that the content-based

restriction violates the First Amendment, the entire Autodialer Provision must be invalidated.[7]

**A. Unless Construed Coextensively with the TCPA, the FTSA's Automated System Provision is Preempted by the Terms of the Federal Statute**

"[T]he Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Medical Labs*, 471 U.S. 707, 712 (1985) (*citing Gibbons v. Ogden*, 9 Wheat. 1, 211 (1824)). Preemption of state law may be express, implied, or otherwise "inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Id.* at 713; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (state law preempted where "under the circumstances of [a] particular case" the law stood as "an obstacle to the accomplishment of Congress's full objectives"); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983) ("Pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose."). "An assumption of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 90 (2000).

**1. The federal Communications Act of 1934, which the TCPA amended, occupies the field of interstate telecommunications**

No presumption against preemption arises here because the regulation of interstate telecommunications is an area with "significant federal presence." *Locke*, 529 U.S. at 90; *see Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) ("[W]e do not apply the presumption against preemption . . . because of the long history of federal presence in regulating long-distance

---

[7] The autodialer interpretation in *Glasser* was approved in *Duguid*, 141 S. Ct. at 1170-72.

telecommunications"); *Chamber of Commerce of U.S. v. Lockyer*, No. 2:05-CV-2257MCEKJM, 2006 Wl 462482, at \*7 (E.D. Cal. Feb. 27, 2006) (finding the presumption against preemption inapplicable to the TCPA due to the "tremendous amount of federal legislation regarding interstate telecommunications" including concerning unsolicited advertisements).

Federal law has "occupied the entire field" where "[t]he federal and the state statutes are directed to the same subject" and "operate upon the same object," and does not turn on whether the federal and state laws "are aimed at distinct and different evils. . . ." *Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 612 (1926). The broad scope of the Communications Act occupies the field of interstate telecommunications. *See Benanti v. United States*, 355 U.S. 96, 104 (1957) (the "Communications Act is a comprehensive scheme for the regulation of interstate communication"); *Harrison Higgins, Inc. v. AT&T Commc'ns*, 697 F. Supp. 220, 222 (E.D. Va. 1988) ("[T]he federal government, through the [Communications] Act or its predecessor, has occupied the field of interstate telecommunications.").

The TCPA's legislative history also makes clear that state laws that regulate interstate telecommunications are preempted by the Communications Act:

> [T]he bill is not intended to preempt State authority regarding *intrastate* communications . . . Pursuant to the general preemptive effect of the Communications Act of 1934, State regulation of *interstate* communications, including interstate communications initiated for telemarketing purposes, *is preempted*.

137 Cong. Rec. S18,781-02, S18784, 1991 WL 252592 (Nov. 27, 1991) (italics added). Further,

> To ensure a *uniform approach* to this nationwide problem, H.R. 1304 would *preempt inconsistent State law*. From the industry's perspective, preemption has the important benefit of ensuring that telemarketers are not subject to two layers of regulation.

137 Cong. Rec. H10339, 10342 (Nov. 18, 1991) (italics added).

Plaintiff's state law claim under the FTSA is barred by field preemption because he seeks

to enforce state law regulation of interstate telemarketing calls against an alleged out-of-state entity (located in Connecticut and incorporated in Delaware) for alleged interstate communications (text messages sent from outside of Florida). SAC ¶¶ 7, 10.

Even if the Communications Act did not already occupy the field of interstate telecommunications broadly, to the extent the FTSA purports to regulate interstate calls made using systems with different parameters than an ATDS, the FTSA interferes with the "careful balance struck by Congress" by subjecting defendants to multiple layers of regulation. *See Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012); *Shaw*, 463 U.S. at 95 (New York statute was preempted to the extent it prohibited practices that were lawful under federal law). Likewise, the broad secondary liability the FTSA imposes on any "person" who "knowingly allows" a "telephonic sales call to be made" using such systems makes unlawful purely extraterritorial conduct that Congress left untouched.

Plaintiff's reliance on *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1548 (7th Cir. 2013) and *Van Bergen v. Minnesota*, 59 F.3d 1541 (8th Cir. 1995), in opposing Subway's motion to temporarily stay discovery, is misplaced. *See* D.E. 19 at 10-11. Both cases are also factually distinguishable in that they involved state laws that were narrower and regulated the use of "automatic dialing-announcing devices" (ADADs), which disseminate a prerecorded or synthesized voice message, and thus differ from an autodialer under the TCPA or an "automated system for the selection or dialing of numbers" under the FTSA, which by contrast broadly prohibits automated devices regardless of the use of a prerecorded voice. Further, neither court was presented with, and thus did not consider, the argument that the Communications Act occupies the field of interstate telecommunications and the TCPA's Savings Clause merely carves out non-

13

preempted exceptions. *See Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2352, 2354 (2020) ("The TCPA of 1991 amended the Communications Act . . .") (applying Communication Act's severability clause to unconstitutional provision in the TCPA). As such, *Patriotic Veterans* erred in applying the initial presumption against preemption. 736 F.3d at 1046. Both cases also failed to address the TCPA's legislative history, which states *unequivocally* that (1) Congress anticipated that "State regulation of *interstate* communications, including interstate communications initiated for telemarketing purposes, *is preempted*"; (2) Congress intended the TCPA to be a "uniform approach to a nationwide problem" of the lack of interstate telemarketing regulation in this area; and (3) that uniformity would provide an added "benefit" of subjecting telemarketers to a consistent scheme of interstate regulation. 137 Cong. Rec. at S18784, (italics added); 137 Cong. Rec. at 10342.[8]

> **2.** **The TCPA's savings clause further indicates that the federal statute preempts state regulations affecting *interstate* communications**

The TCPA's savings clause expressly saves from preemption only state laws that solely

---

[8] *Van Bergen*'s reasoning is also flawed in finding that Congress did not intend to occupy the field "of ADAD regulation" (without addressing the Communications Act), and relied solely on a Congressional Statement of Findings that "over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation; therefore Federal law is needed to control residential marketing practices." 59 F.3d at 1549. But in concluding that this statement "suggest[ed] that the TCPA was intended not to supplant state law, but to provide interstitial law preventing evasion of state law by calling across state lines," 59 F.3d at 1548, *Van Bergen* ignored the clear intent that the TCPA was intended to supplant state regulations of *interstate* telecommunications. Indeed, the Statement of Finding indicates that Congress believed federal law was *necessary* to regulate the vacuum of interstate telemarketing in the same way state laws were regulating purely *intrastate* telemarketing. These state laws had left *inter*state communications unregulated; otherwise, telemarketers would not have been able to evade those laws by calling from across state lines. The finding says nothing about whether, once Congress enacted the TCPA, state laws could then interpose inconsistent interstate regulations on telecommunications the TCPA was already regulating. In other words, the court conflated evidence of necessity with evidence of non-preemption.

regulate *intrastate* communications that fall within the categories delineated by this provision. 47 U.S.C. § 227(f)(1) ("[N]othing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations . . ."). State laws regulating interstate telecommunications that do not fall within the savings clause and are impliedly preempted, due to the Communication Act's occupation of the field of interstate telecommunications. *See Benanti v. United States*, 355 U.S. 96, 104 (1957); 47 U.S.C. § 227(f)(1).

The FTSA's Autodialer System Provision does not fall within the TCPA's savings clause because it regulates interstate calls and intrastate calls equally. It neither "imposes more restrictive intrastate requirements or regulations on" nor "prohibits" either "(B) the use of "automatic telephone dialing systems" or "(D) the making of telephone solicitations" as defined by the TCPA. 47 U.S.C. § 227(f)(1). The statute does not limit the regulation of "telephonic sales calls" using an "automated system" to solely *intrastate* activities, and also, by its terms, restricts interstate calls made from outside the state to a Florida area code or a person located in Florida.

Based on the TCPA's savings clause, plaintiff's claim under the FTSA is preempted. Here, plaintiff does not allege any facts to suggest that the alleged text messages were made from a caller within Florida. To the contrary, the SAC alleges that "Defendant is a Delaware corporation whose principal office is located in Milford, Connecticut," and "Defendant initiated and directed, or caused to be initiated and directed by its agent(s), telemarketing and/or advertising text messages *into* Florida." SAC ¶¶ 7, 10 (italics added). Plaintiff's allegations do not describe a call that occurred wholly within the state's borders. Thus, plaintiff is clearly invoking the FTSA's restrictions to impose liability on *interstate* conduct, which is barred by the TCPA's savings clause.

15

**B. FTSA Violates the Dormant Commerce Clause because it Regulates Wholly Extraterritorial Communications and Unduly Burdens Interstate Telecommunications**

The Dormant Commerce Clause bars state laws such as the FTSA that affect interstate commerce. *See Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989) ("[T]his affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce."); *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1243 (11th Cir. 2012) ("The Commerce Clause grants to Congress the power to regulate interstate and foreign commerce. U.S. Const. art. I, § 8, cl. 3."). "[T]he two ways a law can violate the dormant Commerce Clause are (1) by discriminating against interstate commerce or (2) by unduly burdening interstate commerce." *Fla. Transp. Servs.*, 703 F.3d at 1244. A state law unduly burdens interstate commerce if the burden "clearly exceeds the local benefits." *Id.* at 1245 (internal quotations omitted). This analysis "evaluate[s] the practical effect of the statute in light of what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* at 1245.

"Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336-37.[9] Indeed, the U.S. Supreme Court has invalidated statutes that may adversely

---

[9] *Healy*'s principle of extraterritoriality is not narrowly construed and has been applied in Florida outside of the price-setting context. *See Simmons v. State*, 944 So.2d 317, 334 (2006) (applying to criminal statute); *Southeast Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773, 785 (D.S.C. 2005) (same); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (applying to state anti-corporate takeover statute); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (similar); *Morgan v. Virginia*, 328 U.S. 373 (1946) (holding that state segregation law that "reach[ed] beyond its borders" "interfer[ed] with commerce" "[a]s there is no federal act dealing with the separation of races in interstate transportation"); *Chance v. Lambeth*, 186 F.2d 879, 882 (4th Cir. 1951) (similar). Rather, *Healy* was concerned with the "practical effect" of a law that

16

affect interstate commerce by subjecting activities to inconsistent regulations. *See, e.g.*, *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 583-584 (1986); *Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982) (plurality opinion of White, J.); *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 671 (1981) (plurality opinion of Powell, J.).

### 1.  The FTSA regulates calls occurring wholly outside of Florida

The FTSA regulates extraterritorially in violation of the Commerce Clause because it restricts all telephonic sales calls in the United States regardless of either the caller or the called party's location or residence. The Autodialer Provision applies to any "person" who makes (or allows or causes) any "telephonic sales call" with no geographic limitation on where the call originates. *See* Fla. Stat. § 501.059(1)(j) & (8)(a). A person in Connecticut sending a text message to a person in New York with a Florida area code would facially violate the FTSA by making a sales call using an "automated system" to dial the phone number. The "practical effect" would be to impose liability on the Connecticut caller for a call occurring wholly outside of Florida. Any person located anywhere who makes a sales call (or causes or knowingly allows a telephonic sales call to be made) to any person with a Florida area code would presumptively violate the FTSA (pursuant to the Area Code Presumption), regardless of where the call actually took place.

Thus, the FTSA violates the dormant Commerce Clause because it applies to "commerce" (here, telephone solicitation calls) "that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336.

---

projects itself into the jurisdiction of another state. 491 U.S. at 332. No state has the Constitutional authority to regulate purely extraterritorial conduct.

### 2.  The FTSA unduly burdens interstate commerce

The FTSA also unduly burdens interstate telecommunications by subjecting sales calls using "automated" phone systems to inconsistent regulations – most notably under the TCPA where *Duguid* ruled that liability under the autodialer provision of the TCPA cannot be expanded to systems that merely dial phone numbers stored in a database. *See* 141 S. Ct. at 1170-71 (holding "that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator" to constitute an ATDS). If the FTSA is not construed coextensively with the TCPA's autodialer definition, "persons" making a sales calls would be required to implement different practices for calling Florida phone numbers or persons located in Florida,[10] or comply with the FTSA for all calls regardless of whether a Florida number is used because it would be more costly and less efficient to engage in disparate practices. The FTSA effectively would force callers and businesses to invest in phone equipment that (unlike most modern systems) does not use a "computer software system" to select or dial phone numbers, as plaintiff alleges. Such expenditures would unduly burden interstate commerce. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 140 (1970) (where state statute would effectively require out-of-state company to build facilities in state costing approximately $200,000, the burden on interstate commerce was not justified by the state's "tenuous interest" in having products identified as originating in state).

The adverse impact that the FTSA would have on interstate commerce (if construed as broadly as plaintiff urges) is not outweighed by any local interests. *See Norwegian Cruise Line*

---

[10] Similarly, allowing other states to create a broad, extraterritorial law regulating use an autodialer inconsistent with TCPA/federal law would create a byzantine web of inconsistent state regulations in an area of interstate commerce that has historically been subject to expansive federal regulation.

*Holdings Ltd. v. Rivkees*, 21-22492-CIV-WILLIAMS, 2021 WL 3471585, at *18-19 (S.D. Fla. Aug. 8, 2021) ("In applying the *Pike* balancing test, courts consider whether states could have implemented alternatives that impose smaller, less substantial burdens on interstate commerce. . . . In the absence of any articulated local purpose, the Court need not move any further in the *Pike* analysis."). A review of the Senate Bill 1120's legislative history reveals no particular local interest advanced by the Autodialer Provision itself. While the Florida Legislature expressed the general concern that "[c]onsumers are often inundated with unwanted calls," citing 293,071 complaints from Florida consumers to the FTC, nothing in the legislative history suggests that unwanted telemarketing calls are unique to Floridians. *See* Fl. Comm. Report on CS/SB 1120, 2021 FL S.B. 1120 (NS), at 2 (Mar. 25, 2021). Indeed, according to the same FTC statistics, adjusted for population, Florida ranks in the middle of the pack, slightly above the median (at 1,365 complaints per 100,000 people, compared to 1,165). *See* Federal Trade Commission, *Do Not Call Data Book 2020* (Oct. 2020) at 9, https://www.ftc.gov/system/files/documents/reports/national-do-not-call-registry-data-book-fiscal-year-2020/dnc_data_book_2020.pdf (last visited Aug. 24, 2021).[11]

The FTSA's legislative history also does not explain why the TCPA's autodialer definition would be insufficient to protect local interest. Prior to *Duguid*, the Florida Legislature even assumed the Autodialer Provision was coextensive with the TCPA definition of ATDS. *See* Fl.

---

[11] The same FTC data shows Florida has a low amount of active registrations on the National Do Not Call Registry when adjusted for population, ranking 32 out of 50 states. *See* Federal Trade Commission, *Do Not Call Data Book 2020* (Oct. 2020) at 8, https://www.ftc.gov/system/files/documents/reports/national-do-not-call-registry-data-book-fiscal-year-2020/dnc_data_book_2020.pdf (last visited Aug. 24, 2021). Of the 99,844 (34%) Florida complaints describing the unwanted call by topic, over half (54%, or 54,331) specified topics which would not fall under the definition of "telephonic sales call": "Imposters," "Medical & prescriptions," "Computer & technical support," and "Energy, solar & utilities." *Id.* at 19.

Comm. Report on CS/SB 1120, 2021 FL S.B. 1120 (NS), at 2 & n.4 (Mar. 25, 2021). Compared to plaintiff's interpretation of the Autodialer Provision, the TCPA imposes "smaller, less substantial burdens" on interstate commerce by defining the autodialer term in a manner that does not capture most modern phone systems. *See Norwegian Cruise Line*, 2021 WL 3471585, at *18. Moreover, the TCPA already furthers the interest of protecting all consumers (including those living in Florida) from unwanted calls, including autodialed calls. Thus, any local interests underlying the FTSA would not be outweighed because the same interests are protected by federal law under the TCPA.

### C.        The Autodialer Provision of the FTSA Violates the First Amendment

The Autodialer Provision of the FTSA violates the First Amendment because it is a content-based restriction on speech, applying only to "telephonic sales calls." "A law is content-based if a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). "That description applies to a law that 'singles out specific subject matter for differential treatment.'" *Id.*; *see also Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) (invalidating law singling out pharmaceutical marketing as "directed at certain content and . . . aimed at particular speakers").

The FTSA's Autodialer Provision, Fla. Stat. § 501.059(8)(a) (as well as sections (b) through (d)) all single out calls made "for the purpose of soliciting a sale," § 501.059(1)(j), for differential treatment. *Barr* recently held the TCPA's government-debt collection exemption from the TCPA's autodialer provision unconstitutional for this exact reason. 140 S. Ct. at 2346.

Content-based regulations of speech are subject to strict scrutiny, which the FTSA's Autodialer Provision cannot survive. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)

("[A] law that is content based," which "on its face draws distinctions based on the message a speaker conveys" is "subject to strict scrutiny"). "In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell*, 564 U.S. at 571. "[C]ontent-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Id.* at 566. Content-based restrictions are "presumptively unconstitutional" and "heightened judicial scrutiny is warranted" regardless of whether the content restricted is commercial in nature. *See id.* at 565 (citing cases). It remains the State's burden to justify its content-based law by showing that the statute "directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Id.* at 571-72 (citing *Thompson v. Western States Med. Center*, 535 U.S. 357, 373 (2002)). Content-based restrictions on protected commercial speech are sometimes permissible where the government shows that the law has a "neutral justification" or that the provision challenged was designed to "prevent false or misleading speech." *Id.* at 579.

Neither exception applies here. In enacting the FTSA, the Florida Legislature expressed the general concern that "[c]onsumers are often inundated with unwanted calls." *See* Fl. Comm. Report on CS/SB 1120, 2021 FL S.B. 1120 (NS), at 2 (Mar. 25, 2021). But the FTC statistics cited by the Legislature at best indicate that calls experienced by consumers are unwanted not because of their content; over half of the complaints lodged which specified the content of the call would not have fallen under the definition of "telephonic sales call." Moreover, the FTSA defines "telephonic sales call" as a call to consumers for the purpose of soliciting a sale of "any consumer goods or services" or "an extension of credit for consumer goods or services. . . ." Fla. Stat. § 501.059(j). The provision discriminates even among different types of commercial speech. The Legislature's selective treatment of sales calls appears to reflect its unjustified viewpoint that sales

calls are more unwanted than others, and sales calls selling consumer products are uniquely unwanted. *See Sorrell*, 564 U.S. at 579 (rejecting Vermont content-based regulation of pharmacies and pharmaceutical marketers where state did not show why industry was a unique risk to consumers). There is no justification for the FTSA's "differentiation between [sales calls] and other important categories of robocall speech, such as political speech, charitable fundraising, issue advocacy, [government-debt collection], and the like." *See Reed*, 135 S. Ct. at 2347-48. Nor has the Florida Legislature made any finding that calls originating from "automated systems for the selection or dialing of telephone numbers" are less truthful or more misleading than calls originating from a rotary phone. *Id.* at 579. There is therefore no "fit between the legislature's ends and the means chosen to accomplish those ends." *Id.* at 572. "[T]he State cannot engage in content-based discrimination to advance its own side of a debate." *Id.* at 580.

Accordingly, the Autodialer Provision violates the First Amendment and must be invalidated in its entirety because simply severing "sales" from Fla. Stat. § 501.059(8)(a)-(d) would expose all calls made with an "automated system" (including smartphones) to liability under the statute – an outcome that the Supreme Court made clear would not be permitted. *See Duguid*, 141 S. Ct. at 1172; *see also Glasser*, 948 F.3d at 1310 (finding that the First Amendment would not "allow Congress to punish every solicited call to a cell phone").

**D. The Autodialer Provision of the FTSA is Void for Vagueness**

To the extent the Autodialer Provision expressly departs from the ATDS definition, it also facially violates the Fifth Amendment Due Process Clause in its expansive vagueness. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). Economic regulations that

regulate protected speech are not subject to a lower level of scrutiny under the void-for-vagueness

doctrine, because "rigorous adherence to those [First Amendment] requirements is necessary to

ensure that ambiguity does not chill protected speech." *Id.*; *cf. Burns v. Town of Palm Beach*, 999

F.3d 1317, 1349 (11th Cir. 2021) ("Because [Plaintiff's] proposed new mansion does not raise

First Amendment concerns, we apply the less strict vagueness test."). "The vagueness of a content-

based regulation of speech raises special First Amendment concerns because of its obvious chilling

effect." *Fox Television*, 567 U.S. at 254; *see also Jacobs v. the Florida Bar*, 50 F.3d 901, 907 (11th

Cir. 1995) (rejecting "contention that vagueness attacks on rules regulating commercial speech are

not permitted"). But "even when speech is not at issue, the void for vagueness doctrine addresses

at least two . . . due process concerns: first, that the regulated parties should know what is required

of them so they may act accordingly; second, precision and guidance are necessary so that those

enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at

254.

　　As explained, the Autodialer Provision is unquestionably a content-based regulation of

speech, because it applies only to telephonic sales calls. The vagueness of the provision creates a

chilling effect on commercial speech by functionally discouraging all sales calls. Unmoored from

*Duguid*, any modern smart phone may constitute an "automated system." *See Papachristou v. City

of Jacksonville*, 405 U.S. 156, 164 (1972) (voiding vagrancy law which, applied literally, embraced

everyday activities). it is unclear what type of "automated systems" are subject to the restriction

on "telephonic sales calls." The statute "fails to give a person of ordinary intelligence fair notice

that his contemplated conduct is forbidden" and has impermissibly invited arbitrary enforcement

by the courts. *Id.* at 162.

**E.  Alternatively, the Autodialer Provision Should be Construed as Coextensive with the TCPA's Autodialer Definition based on Constitutional Avoidance**

The doctrine of constitutional avoidance dictates that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *DeBartolo Corp. v. Fla. Gulf Coast Trades Council*, 485 U.S. 568, 575 (1988). The court "must independently inquire whether there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed to" the statute. *Id.*; *see Southlake Prop. Assoc. v. City of Morrow*, 112 F.3d 1114, 1118 (11th Cir. 1997) (holding that in evaluating a facial challenge to a statute, the court must construe ambiguity to avoid constitutional problems); *see also Moore v. Sims*, 442 U.S. 415, 429 (1979) ("Almost every constitutional challenge . . . offers the opportunity for narrowing constructions that might obviate the constitutional problem and intelligently mediate federal constitutional concerns and state interests.").

The Autodialer Provision presents potential ambiguities that could lead to different interpretations. For example, it could potentially be construed to restrict sales calls using virtually most modern phone systems and smartphones, as under plaintiff's construction, or more narrowly because "system" is not defined by the statute. Similarly, the FTSA's use of the term "automated" provides no guidance on what that means in practice, or whether it refers only to the automated selection or dialing of phone numbers. The Court here would be required to engage in a "line-drawing exercise around how much automation is too much," which the Supreme Court in *Duguid* declined to do in refusing to define autodialer based on "automatic" dialing. 141 S. Ct. at 1171 n.6.

Further, as discussed in the prior sections, construing "automated system for the selection or dialing of telephone numbers" to regulate or prohibit the use of different types of systems that

would not be restricted by the TCPA's autodialer provision raises Supremacy Clause and Commerce Clause concerns.

Thus, faced with the choice of interpreting the Autodialer Provision in a manner that raises serious constitutional problems, or adopting a definition coextensive with the autodialer definition set forth in *Duguid*, the doctrine of constitutional avoidance compels choosing the latter.[12]

### III.    Conclusion

For all of the foregoing reasons, dismissal should be granted with prejudice.

Dated: October 5, 2021                                        Respectfully submitted,

                                                  **GREENBERG TRAURIG, P.A.**
*Counsel for Defendant Subway Franchisee Advertising Fund Trust Ltd.*
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile:  (305) 579-0717

**GREENBERG TRAURIG, LLP**
1840 Century Park East
Suite 1900
Telephone: (310) 586-6575
Facsimile: (310) 586-7800
IAN C. BALLON
admitted *pro hac vice*
ballon@gtlaw.com


By:    /s/ *Mark A. Salky*
        MARK A. SALKY
        Florida Bar No. 058221
        Email: salkym@gtlaw.com

---

[12] However, if the Court finds the Autodialer Provision to violate the First Amendment, the entire provision should be struck down. Unlike the TCPA, which contains an express severability clause, the Florida Legislature has not indicated its preference should some part of the FTSA be held unconstitutional, and on that basis is distinguishable from *Barr. See* 140 S. Ct. at 2349. The only practical result, should the Court find a First Amendment violation, is the invalidation of section 501.059.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of October, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


                                         /s/ *Mark A. Salky*
                                         MARK A. SALKY


## SERVICE LIST

*Ryan Turizo v. Doctor's Associates, LLC*
**CASE NO.: 0:21-cv-61493-20592-CIV-RUIZ/STRAUSS**
**United States District Court, Southern District of Florida**

**Hiraldo P.A.**
Manuel S. Hiraldo, Esq.
401 East Las Olas Boulevard
Suite 1400
Ft. Lauderdale, FL 33301
Email: mhiraldo@hiraldolaw.com

*Attorneys for Plaintiff Ryan Turizo*