## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CIV-61493-RAR

**RYAN TURIZO**, *individually and*
*on behalf of all others similarly situated*,

      Plaintiff,

v.

**SUBWAY FRANCHISEE**
**ADVERTISING FUND TRUST LTD.**,

      Defendant.

_____/

### <u>ORDER DENYING DEFENDANT'S MOTION TO DISMISS</u>

    **THIS CAUSE** comes before the Court upon Defendant's Motion to Dismiss Second

Amended Class Complaint [ECF No. 24], filed on October 15, 2021. Plaintiff filed a Response in

Opposition [ECF No. 30] on October 28, 2021, Defendant filed a Reply in Support [ECF No. 34]

on November 12, 2021, and Plaintiff filed a Sur-Reply in Opposition [ECF No. 35-1] on November

17, 2021. The Court having carefully considered the parties' briefing, the record, and applicable

law, it is hereby

    **ORDERED AND ADJUDGED** that Defendant's Motion is **DENIED** as set forth herein.

### <u>BACKGROUND</u>

    Plaintiff brings this putative class action[1] under the federal Telephone Consumer Protection

Act ("TCPA") and Florida's corollary statute, the Florida Telephone Solicitation Act ("FTSA").

[ECF No. 16] ("Second Am. Compl.") ¶ 1. Plaintiff alleges that Defendant provides advertising

on behalf of Subway franchises throughout the United States. *Id.* ¶ 2. In the course of its

---

[1] Because the arguments in Defendant's Motion apply identically to Plaintiff's individual and class claims, the Court finds it unnecessary to separately elaborate on the class allegations. *See* [ECF No. 16] ¶¶ 35–45.

advertising, Defendant allegedly sends unsolicited text messages to individuals who have registered their cellphone numbers on the National Do Not Call Registry ("DNC Registry") and have not consented to receiving text messages from Defendant. *Id.* ¶ 3. Plaintiff alleges that his cellphone number has been registered on the DNC Registry since September 18, 2020. *Id.* ¶ 16. Plaintiff also alleges that he never gave Defendant prior written consent to send Plaintiff text messages. *Id.* ¶ 31. Despite registration on the DNC Registry and Plaintiff's lack of consent, Defendant allegedly "bombarded" Plaintiff's cellphone with text message solicitations—including discount codes and invitations to order Subway products online. *Id.* ¶¶ 11–12.

Plaintiff alleges that Defendant used a computer software system to automatically select and dial Plaintiff's cellphone number. Second Am. Compl. ¶ 21. Plaintiff further alleges that this text messaging platform was able to transmit thousands of text messages without any human involvement. *Id.* ¶ 25. To support his allegation that the messages were sent via an automated system, Plaintiff points out that Defendant's website refers to the messaging platform as an "automated system" that sends "autodialed ads." *Id.* ¶ 30. Plaintiff also alleges that the generic, impersonal nature of the advertisements indicates the messages were sent via an automated system. *Id.* ¶ 24. Finally, Plaintiff alleges that he received the messages from a "short code" telephone number, which cannot be assigned to a standard telephone, further evidencing the automated nature of Defendant's text message solicitations. *Id.* ¶¶ 22–23.

Based on these allegations, Plaintiff brings two causes of action. Count One alleges that Defendant violated the TCPA's prohibition on soliciting phone numbers on the DNC Registry, also known as the "do-not-call" provision. Second Am. Compl. ¶¶ 51–52. Count Two alleges that Defendant sent telephone solicitations using an automated system for the selection and dialing of telephone numbers, in violation of the FTSA. *Id.* ¶¶ 58–60. Plaintiff seeks statutory, actual, and

treble damages for Defendant's alleged statutory violations, as well as an injunction enjoining Defendant from continued unsolicited telephone advertisement. *See id.* at 15–16.

Defendant now moves to dismiss Plaintiff's Second Amended Complaint for failure to state a claim upon which relief can be granted. *See* Mot. at 2. As to Count One, Defendant argues that the TCPA's do-not-call provision applies only to "residential" telephone numbers, not wireless numbers like Plaintiff's cellphone. *Id.* As to Count Two, Defendant argues that Plaintiff's claim is barred by the Supreme Court's recent decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021). Mot. at 2. Alternatively, if *Duguid* does not bar Count Two, Defendant argues that the FTSA (i) is preempted by the TCPA; (ii) violates the Dormant Commerce Clause; (iii) violates the First Amendment; (iv) is unconstitutionally vague; and (v) should be interpreted "as coextensive" with the TCPA based on the doctrine of Constitutional Avoidance. *See generally id.*

## LEGAL STANDARD

A pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). If a plaintiff fails to satisfy this requirement, the defendant may move to dismiss the complaint. *Id.* R. 12(b)(6). To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A pleading that offers "labels and conclusions," "naked assertion[s]," or "a formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss. *Id.* (alteration in original).

When deciding a motion under Rule 12(b)(6), a court must "view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Ziyadat v. Diamondrock Hospitality Co.*, 3 F.4th 1291, 1296 (11th Cir. 2021). Additionally, if a court can draw any reasonable inferences from the allegations in the complaint, the court must draw those inferences in favor of the plaintiff. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citation and quotation omitted).

## ANALYSIS

Unlike many motions made under Rule 12(b)(6), Defendant's Motion does not take issue with the sufficiency or plausibility of the facts alleged in Plaintiff's Second Amended Complaint. Rather, Defendant argues that neither the TCPA nor the FTSA provide relief in the scenario alleged by Plaintiff. The Court addresses the parties' arguments about each statute in turn.

### A. Count One – The TCPA

In response to "a torrent of vociferous consumer complaints about intrusive robocalls," Congress passed the TCPA in 1991. *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2344 (2020). Among other things, the TCPA instructed the Federal Communications Commission to "prescribe regulations to implement methods and procedures for protecting the privacy rights [of consumers] . . . in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers." 47 U.S.C. § 227(c)(2). The TCPA explicitly authorized the FCC to establish a "single national database" of telephone numbers belonging to "residential subscribers" who object to receiving telephone solicitations. *Id.* § 227(c)(3).

With that grant of authority, the FCC established the national DNC Registry, and prohibited any person or entity from initiating any telephone solicitation to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). And although section 227(c) and section 64.1200(c)(2)—by their own terms—apply to "residential telephone subscribers," the FCC extended the rule in section 64.1200(c)(2) to cover "wireless telephone numbers." *Id.* § 64.1200(e) (citing *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14039 (2003) ("2003 Order")). In its 2003 Order, the FCC clarified that it "will presume wireless subscribers who ask to be put on the [DNC Registry] to be 'residential subscribers.'" 18 F.C.C.R. at 14039.

The purported upshot of this legislative and administrative framework is that the DNC Registry protections apply to residential and cellphone numbers alike. That interpretation is exactly what Defendant challenges: Defendant argues that the FCC overstepped its rulemaking authority because Congress authorized the FCC to create a registry for "residential subscribers," but not wireless or cellular subscribers. *See* Mot. at 6–7. In support of its position, Defendant points out that the text of the TCPA distinguishes between "residential" and "cellular" telephone lines. *Id.* at 3 (comparing 47 U.S.C. § 227(b)(1)(A)(iii), which concerns prerecorded calls to "cellular" telephone numbers, with 47 U.S.C. § 227(b)(1)(B), which concerns prerecorded calls to "residential" numbers). Thus, Defendants argue that Congress intentionally omitted cellular telephone numbers from section 227(c)(3)'s grant of rulemaking authority to the FCC with respect to the DNC Registry.

The undersigned agrees with Defendant. The TCPA clearly draws a distinction between cellular telephones and residential telephones. *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting

certain prerecorded calls to "any telephone number assigned to a . . . cellular telephone service"), *with id.* § 227(b)(1)(B) (prohibiting the same prerecorded calls to "any residential telephone line"); *see also id.* § 227(b)(2)(H) (permitting the FCC to limit the number and duration of debt collection calls made to a number assigned to a "cellular telephone service," but omitting any reference to debt collection calls made to residential telephone lines). Considering Congress knew of cellular telephones—and in fact referenced cellular telephones as distinct from residential telephones throughout the TCPA—a proper interpretation of the statute would conclude that Congress intentionally omitted any reference to cellular telephones in section 227(c). *See, e.g.*, *Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1262 (11th Cir. 2020) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015) ("Where Congress knows how to say something but chooses not to, its silence is controlling.").

Thus, when Congress granted the FCC authority to create the DNC Registry via section 227(c)(3), Congress intentionally withheld from the FCC any authority to create a registry that included cellular telephone numbers. Consequently, the protections offered to numbers on the DNC Registry, *see* 47 C.F.R. § 64.1200(c)(2), would not apply to cellular telephone numbers, and Plaintiff's claim would be foreclosed. *See* Second Am. Compl. ¶¶ 11–16 (specifying that Plaintiff's TCPA claim concerns text message solicitations received on his cellphone).

Complicating what is otherwise a straightforward issue of statutory interpretation, however, is 47 C.F.R. § 64.1200(e). In that provision, the FCC states that the "rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the

[2003 Order]." 47 C.F.R. § 64.1200(e). Yet the 2003 Order itself recognizes that section 227(c) granted the FCC authority with respect to "residential" numbers only. *See* 18 F.C.C.R. at 14039 (recognizing that Congress explicitly "expressed concern with residential privacy" when discussing the do-not-call list). The 2003 Order further acknowledges that Congress granted the FCC authority to regulate both wireless and residential numbers in the context of prerecorded messages. *Id.* (citing 47 U.S.C. § 227(b)(1)(A)(iii)). Despite acknowledging Congress's different uses of "residential" and "cellular" in the text of the statute, the 2003 Order reasons that "the overall intent of the TCPA" would allow wireless subscribers to benefit from the DNC Registry protections. 18 F.C.C.R. at 14039 ("Therefore, we conclude that wireless subscribers may participate in the national do-not-call list.").

As pointed out by Defendant, the FCC's assumptions as to congressional intent should not suffice to create an entirely new private right of action for cellular telephone subscribers. Indeed, section 227(c)(5) provides a private right of action for those on the DNC Registry who receive more than one unsolicited telephone call from the same entity within a twelve-month period. 47 U.S.C. § 227(c)(5). And by its very terms, the DNC Registry's protections apply to "residential telephone subscribers." *Id.* § 227(c)(1). But by presuming that any wireless number on the DNC Registry qualifies as "residential," the FCC expands section 227(c)(5)'s right of action to cellular telephone subscribers—without any congressional grant of authority to do so. Accordingly, the undersigned agrees with Defendant's arguments regarding the TCPA.

However, the Court lacks jurisdiction to review a final order of the FCC, including the 2003 Order. *F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the Court of Appeals."). Further, while Defendant asserts that this Court is not bound by the 2003 Order, *see* Reply at 5, the Eleventh Circuit has held that district courts "may not determine the validity of FCC orders, including by

refusing to enforce an FCC interpretation, because '[d]eeming agency action invalid or ineffective is precisely the sort of review the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders.'" *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1307 (11th Cir. 2015) (quoting *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120–21 (11th Cir. 2014)); *but see Gorss Motels, Inc. v. Safemark Sys. LP*, 931 F.3d 1094, 1106 (11th Cir. 2019) (Pryor, J., concurring) ("I write separately to explain that our precedents have misconstrued the [Hobbs] Act's grant of exclusive jurisdiction to the circuit courts . . . to determine the validity of certain agency orders . . . .  The Hobbs Act, correctly construed, does not require district courts adjudicating cases within their ordinary jurisdiction to treat agency orders that interpret federal statutes as binding precedent.") (quotations and citation omitted).  Until the Eleventh Circuit revisits its Hobbs Act precedent en banc, *see Gorss*, 931 F.3d at 1106, this Court must afford the 2003 Order deference, and "may only consider whether [Defendant's] alleged action violates the FCC rules or regulations" as currently written.  *Murphy*, 797 F.3d at 1307.

Despite an unauthorized expansion of the private right of action for violations of the TCPA's do-not-call provision, the Court must enforce the rules and regulations set forth by the FCC.  Those rules prohibit unsolicited telephone advertisements to residential and cellular telephone numbers that have been registered on the DNC Registry.  47 C.F.R. §§ 64.1200(c), (e).  Therefore, Plaintiff has stated a claim for relief under the TCPA, and Defendant's request to dismiss Count One is **DENIED**.

**B.  Count Two – The FTSA**

In Count Two of his Second Amended Complaint, Plaintiff alleges Defendant violated the "autodialer provision" of the FTSA, which provides that "[a] person may not make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers . . . without the prior express written consent of the called party."

Fla. Stat. § 501.059(8)(a).  Taking his allegations as true, Plaintiff has plausibly alleged that Defendant violated the autodialer provision by using an "automated system" to transmit the text message solicitations at issue.  *See* Second Am. Compl. ¶¶ 21–30.

Instead of contesting the sufficiency of Plaintiff's factual allegations, Defendant lodges a multitude of legal challenges against the FTSA's autodialer provision.  First, Defendant argues that the Supreme Court's interpretation of the TCPA in *Duguid* forecloses the relief Plaintiff seeks under the FTSA.  *See* Mot. at 9.  Second, Defendant asserts that section 501.059(8) violates a host of constitutional provisions, including the Supremacy Clause, Commerce Clause, First Amendment, and Fifth Amendment's Due Process Clause.  *Id.* at 9–11.

### 1. The relief sought by Plaintiff is not foreclosed by <u>*Facebook, Inc. v. Duguid*</u>.

In *Duguid*, the Supreme Court addressed what could be characterized as the federal version of Plaintiff's claim under the FTSA.  In that case, plaintiff Noah Duguid alleged that defendant Facebook, Inc. sent him several text messages regarding his Facebook account.  141 S. Ct. at 1168. Duguid, however, never had a Facebook account, never gave Facebook his cellphone number, and never consented to receiving text messages from Facebook.  *Id.*  Duguid sued Facebook, claiming Facebook violated the TCPA's autodialer provision, which prohibits using "any automatic telephone dialing system" to make calls to "any telephone number assigned to a paging service [or] cellular telephone service" without prior consent from the called party.  *Id.* at 1167–68 (quoting 47 U.S.C. § 227(b)(1)(A)) (alteration in original).  Significantly, the TCPA defines "automatic telephone dialing system": "The term 'automatic telephone dialing system' means equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers."  47 U.S.C. § 227(a)(1).

Facebook moved to dismiss Duguid's suit, arguing that because Duguid did not allege Facebook sent text messages to randomly or sequentially generated numbers, Duguid failed to

sufficiently allege that Facebook used an automated dialing system within the meaning of the TCPA. 141 S. Ct. at 1168. The district court agreed and dismissed Duguid's case with prejudice, but the Ninth Circuit reversed, concluding that an automatic dialing system need not have the ability to randomly or sequentially generate numbers, just the ability to store numbers and dial those numbers automatically. *Id.* The Supreme Court reversed the Ninth Circuit, holding that the plain language of section 227(a)(1) requires an automated dialing system to be one that uses a random or sequential number generator. *Id.* at 1170, 1173.

In contrast to the TCPA's explicit definition of "automatic telephone dialing system," the FTSA does not offer a definition for an "automated system for the selection or dialing of telephone numbers." In other words, while the TCPA defines exactly what constitutes an autodialer, the FTSA does not. Consequently—unlike the TCPA—nothing in the FTSA requires an autodialer to be capable of randomly or sequentially generating telephone numbers. *See generally* Fla. Stat. § 501.059.

Defendant contends that because the term "automated" is not defined by the FTSA, this Court should interpret that term "as coextensive" with the Supreme Court's interpretation of the TCPA in *Duguid*. *See* Mot. at 9–10. According to Defendant, a coextensive interpretation would prevent the FTSA's autodialer provision from being interpreted more broadly than federal law. *Id.* However, when words are "conspicuously absent" from the definition of a statutory term, courts "are not allowed to add words to or rewrite [the] statute." *Smith ex rel. MS v. Crisp Reg'l Hosp., Inc.*, 985 F.3d 1306, 1309 (11th Cir. 2021). Here, the words "random" and "sequential" are conspicuously absent from the FTSA. As such, the Court declines to interpret the FTSA's autodialer provision as requiring some degree of randomized or sequential number generation.[2]

---

[2] The Court also notes the duality of the arguments in Defendant's Motion. On one hand, Defendant argues that because the word "cellular" is absent from the FCC's authority regarding the DNC Registry, Count

Accordingly, the Supreme Court's decision in *Duguid* does not bar Plaintiff's request for relief under the FTSA, and Plaintiff's failure to allege randomized or sequential number generation does not warrant dismissal.

### 2. The FTSA is not preempted by the TCPA.

Defendant next argues that the TCPA "occupies the field of interstate communications." Mot. at 12. And therefore, the TCPA preempts the FTSA's autodialer provision because, as written, the FTSA's autodialer provision is not limited to wholly intrastate communications. Defendant's preemption argument rests on two theories: first, that there is a "significant federal presence" in the area of interstate communication and second, that the legislative history of the TCPA suggests that state regulation of interstate communication would be preempted. *Id.* at 12–13.

(i) <u>Federal Presence in Interstate Communication.</u>

As to Defendant's first theory, the Court's analysis begins by acknowledging that the TCPA "shall not preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits . . . the use of automatic telephone dialing systems." 47 U.S.C. § 227(f)(1)(B). Defendant claims that the text messages in this case do not fall within the TCPA's savings clause because the messages were sent from outside of Florida—making them interstate communications—the regulation of which can only come from the TCPA. Mot. at 13–14; Reply at 6. Three issues arise with Defendant's argument.

The first issue is the fact-specific nature of Defendant's position regarding the origin of the text messages. Certainly, Plaintiff has alleged that Defendant is incorporated in Delaware and has

---

One is not cognizable under the TCPA. *See supra* Part A. On the other hand, when it comes to the FTSA, Defendant asks the Court—despite the words "random" or "sequential" not appearing in the statute—to read those words into the meaning of "automated." Defendant cannot have it both ways.

its principal place of business in Connecticut.  Second Am. Compl. ¶ 10.  But Plaintiff does not allege a specific location from where the text messages at issue originated, and there is no reason to believe that the messages must have come from either Defendant's state of incorporation or its principal place of business.  Defendant emphasizes that the Second Amended Complaint says the messages were sent "into Florida," *see id.* ¶ 7, but that is hardly enough to conclude—especially when the Court must draw all inferences in favor of Plaintiff—that the messages undoubtedly originated from outside the State of Florida.  Thus, as an initial matter, the Court doubts whether it can consider Defendant's position that the text messages were sent from outside Florida.

The second issue is the weight of case law declining to adopt Defendant's argument regarding preemption.  Although the Eleventh Circuit has not weighed in on the TCPA-preemption issue, both the Seventh and Eighth Circuits have, squarely rejecting Defendant's position.  *See Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041 (7th Cir. 2013); *Van Bergen v. Minnesota*, 59 F.3d 1541 (8th Cir. 1995).  At issue in *Patriotic Veterans* was Indiana's Automated Dialing Machine Statute, which banned autodialed calls absent prior consent from the called party.  736 F.3d at 1044 (citing Ind. Code § 24-5-14-5(b)).  Patriotic Veterans—who made autodialed calls from Illinois—sought an injunction enjoining enforcement of Indiana's autodialer statute, arguing that it was preempted by the TCPA due to the interstate nature of the autodialed calls.  736 F.3d at 1044–45.  The Seventh Circuit disagreed with Patriotic Veterans' position.  *Id.* at 1054 ("It is clear that the TCPA does not expressly or impliedly preempt the Indiana statute and we so hold.").  The court reasoned that the TCPA's savings clause "is the first and best evidence that the federal government did not intend to occupy the entire field of robocall regulation."  *Id.* at 1051.  The court also pointed out that the TCPA "expressly contemplates that states will continue to regulate telemarketing," and that "states have long regulated the content of abusive telephone calls, and interferences with the peaceful enjoyment of the home."  *Id.*  And although the state law was more

restrictive than the TCPA, it "in no way" frustrated the requirements of the TCPA. *Id.* Thus, the Seventh Circuit concluded that the TCPA did not preempt the Indiana autodialer statute, even with the interstate nature of Patriotic Veterans' autodialed calls.

Similarly, the Eighth Circuit in *Van Bergen* upheld a state autodialer statute in the face of a preemption challenge. Like *Patriotic Veterans*, the court in *Van Bergen* concluded that the TCPA was not meant to occupy the field of autodialer regulation. 59 F.3d at 1548. The court also concluded that "the TCPA was not intended to supplant state law, but to provide interstitial law preventing evasion of state law by calling across state lines." *Id.*; *see also Patriotic Veterans*, 736 F.3d at 1045 (noting the TCPA was intended to "supplement" states' restrictions on telemarketing). The Eighth Circuit therefore found "that the TCPA does not expressly preempt state law, nor is it implied in the TCPA that Congress intended to preempt state law, nor does the Minnesota statute conflict with the TCPA. Therefore, the Minnesota statute is not preempted by the TCPA." 59 F.3d at 1548.[3]

The third issue is Defendant's inaccurate reading of the TCPA's savings clause. Section 227(f)(1) states that the TCPA does not preempt "any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits . . . the use of automatic telephone dialing systems." 47 U.S.C. § 227(f)(1)(B). Defendant's proposed interpretation would have the word "intrastate" modify both the term "requirements or regulations" and the term "prohibits." But the grammatical structure of the statute disfavors such a reading. First, the comma preceding

---

[3] Multiple district courts have also rejected Defendant's argument regarding interstate robocalls. *E.g.*, *Sussman v. I.C. Sys., Inc.*, 928 F. Supp. 2d 784, 790–92 (S.D.N.Y. 2013) (holding the TCPA did not preempt New York's autodialer statute, even when the autodialed calls originated outside New York); *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1132 (W.D. Wash. 2012) ("Since [the Washington autodialer statute] is a prohibition on interstate telephone solicitations and prohibitions on interstate telephone solicitations are within the savings clause, [the statute] is included within the TCPA's savings clause and is not preempted.").

the phrase "or which prohibits" creates a different clause for prohibitions on automatic dialing systems, a clause not subject to the "intrastate" modifier.  Second, fundamental principles of grammar specify the words "that" and "which" are not interchangeable.  Thus, the use of "which" immediately before the word "prohibits" requires the reader to go back to the part of the sentence before the word "that."  Accordingly, a proper reading of section 227(f)(1) is that the TCPA does not preempt any state law (i) that imposes more restrictive intrastate requirements or regulations on automatic dialing systems or (ii) which prohibits automatic dialing systems.  Under this reading, prohibitions on autodialers are not subject to the "intrastate" modifier. *See United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 963–64 (C.D. Ill. 2009) (concluding the "intrastate" modifier did not apply to prohibitions on the conduct set forth in section 227(f)(1)(A)–(D)).

In sum, it is questionable whether the purportedly interstate nature of Defendant's text messages is something the Court can consider at this stage in the litigation. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review on a motion to dismiss is limited to the four corners of the complaint.") (quotation omitted).  Further, even assuming the messages crossed state lines, neither the plain language of section 227(f)(1) nor the case law support Defendant's argument that the TCPA preempts the FTSA's autodialer provision in interstate contexts.  As such, Defendant's preemption argument fails.

(ii)  <u>Legislative History.</u>

The Court also declines to find preemption based on a single legislative statement.  First, in light of the unambiguous plain reading of the statute, a "frolic and detour into the legislative history and the intent of legislation's sponsor is unnecessary." *Patriotic Veterans*, 736 F.3d at 1054.  Second, some of the legislative history contradicts Defendant's argument for preemption— the statement of Representative Rinaldo indicates the TCPA preempts only "*inconsistent State law*." 137 Cong. Rec. H10339, 10342 (daily ed. Nov. 18, 1991) (emphasis added).  Preemption

of inconsistent state law, also called "conflict preemption," is not the same as the field preemption for which Defendant argues. *See Lawson-ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 920–21 (11th Cir. 2020). As such, the legislative history does not definitively show congressional intent to occupy the field of interstate communications. Third, the statements made on the legislative record assumed that states would not have jurisdiction to regulate interstate communications. *See, e.g.*, S. Rep. No. 102-178, at 3 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1970 ("[States' restrictions on autodialers] have had limited effect, however, because States do not have jurisdiction over interstate calls."). However, this likely incorrect assumption does not serve to divest states of jurisdiction over all interstate calls, nor is it dispositive on whether states may in fact regulate interstate telecommunications. *See Patriotic Veterans*, 736 F.3d at 1053.

At bottom, the TCPA supplements, not supplants, the FTSA's autodialer provision. That the FTSA is more restrictive or prohibitive than the TCPA does not mandate preemption. Consequently, the Court rejects Defendant's preemption argument.

### 3. The FTSA does not violate the Dormant Commerce Clause.

Like Defendant's preemption argument, Defendant's third argument hinges on the interstate features of the FTSA's autodialer provision. Defendant claims the FTSA's autodialer provision violates the Dormant Commerce Clause "because it regulates wholly extraterritorial communications and unduly burdens interstate telecommunications." Mot. at 17.

The Commerce Clause gives Congress the power to regulate interstate and foreign commerce. U.S. Const. art. I, § 8, cl. 3. This affirmative grant of authority to Congress encompasses an implicit or "dormant" limitation on states' authority to regulate interstate commerce. *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1243 (11th Cir. 2012) (citing *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326 n.1 (1989)). The Eleventh Circuit has

established a two-tiered analysis for challenges under the Dormant Commerce Clause: (i) whether the state law "directly regulates or discriminates against interstate commerce, or has the effect of favoring in-state economic interests," and (ii) whether the state law "unduly burden[s] interstate commerce." *Fla. Transp.*, 703 F.3d at 1243–44.  To determine whether a law unduly burdens interstate commerce, courts use the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Id.*

<u>(i)  The FTSA does not regulate conduct "wholly outside of Florida."</u>

Defendant first asserts that the FTSA regulates calls occurring wholly outside of Florida— in other words, that the FTSA directly regulates interstate commerce.  Mot. at 18.  Defendant's argument turns on the FTSA's "area code presumption," which establishes "a rebuttable presumption that a telephonic sales call made to any area code in this state is made to a Florida resident or to a person in this state at the time of the call."  Fla. Stat. § 501.059(8)(d).  Defendant posits that any person autodialing a telephone number with a Florida area code would presumptively violate the FTSA, regardless of where the call actually took place.  Mot. at 18.

Defendant overstates the potential for liability under the FTSA.  As a practical matter, the FTSA's area code presumption is a rebuttable one.  *See* Fla. Stat. § 501.059(8)(d).  Thus, by the statute's own terms, the autodialer provision does not extend to calls to non-Florida residents or persons outside the state.  *See id.*  All the area code presumption does is task a defendant with showing that, despite autodialing a Florida area code, the called party was not actually a Florida resident or in Florida when the call was placed.  The fact that the FTSA places an evidentiary burden on a defendant does not violate the Dormant Commerce Clause.  Further, and in the same vein, Defendant's extraterritoriality argument ignores several provisions of the FTSA that demonstrate the nexus a certain communication must have to Florida to be covered by the FTSA. *See, e.g.*, Fla. Stat. §§ 501.059(1)(e), (8)(d) (limiting the FTSA's scope to calls from Florida or to

consumers in Florida).  Accordingly, the FTSA does not regulate conduct "wholly outside of Florida."

    (ii)  <u>The FTSA does not place an undue burden on interstate commerce.</u>

Next, Defendant asserts that the FTSA violates the Dormant Commerce Clause by unduly burdening interstate commerce.  Mot. at 19.  As a general rule, when a statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142.  Assuming a legitimate public interest is identified, "the question becomes one of degree."  *Id.*  Courts must consider how much of a burden on interstate commerce is justified by the local public interest.  *See id.*

"Americans passionately disagree about many things.  But they are largely united in their disdain for robocalls."  *Barr*, 140 S. Ct. at 2343.  Both federal and state governments field a "staggering number of complaints about robocalls" each year.  *Id.*  Thus, despite Defendant's argument to the contrary, it hardly seems disputed that the FTSA's autodialer provision advances a legitimate public interest: protecting Floridians from annoying and harassing robocalls that may harm financial interests by tying up businesses' phone lines and wasting individuals' time and productivity.  And importantly, the burden on interstate commerce is minimal.  To avoid liability under the FTSA's autodialer provision, Defendant has at least two options: employ human means to select and dial telephone numbers, or to obtain consent from the called parties before using an autodialer to contact them.  Conveniently enough, these two options are also congressionally approved ways to avoid liability under the TCPA's autodialer provision.  *See* 47 U.S.C. § 227(b)(1).  That Defendant might have to incur more costs or less efficient telemarketing practices, *see* Mot. at 19, does not render the FTSA unconstitutional.  *See Ga. Manufactured Hous. Ass'n, Inc. v. Spalding Cnty., Ga.*, 148 F.3d 1304, 1308 (11th Cir. 1998) ("[P]rice increases generally do

not violate the dormant Commerce Clause.") (citing *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978)).

The autodialer provision neither directly regulates interstate commerce nor unduly burdens interstate commerce.  Accordingly, the FTSA's autodialer provision does not violate the Dormant Commerce Clause.

### 4. The FTSA does not run afoul of the First Amendment.

Defendant next argues that the autodialer provision of the FTSA violates the First Amendment.  Mot. at 21.  Defendant claims the FTSA imposes a content-based restriction[4] on "calls made 'for the purpose of soliciting a sale,'" and is therefore subject to strict scrutiny.  *Id.* (citing Fla. Stat. § 501.059(1)(j)).  Plaintiff disagrees with Defendant's characterization, arguing the FTSA's Autodialer Provision restricts commercial speech and is thus subject to intermediate scrutiny.  Resp. at 17.  Commercial speech is defined as an "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).  To satisfy the intermediate scrutiny standard, a law must be "narrowly drawn" to "directly and materially advance" a "substantial [government] interest."  *Id.* at 624 (citing *Cent. Hudson Gas*, 447 U.S. at 564–65).  This Court agrees with Plaintiff, finding FTSA's Autodialer Provision restricts commercial speech—and thus, is subject to intermediate scrutiny—because the provision refers only to "telephonic sales calls"—*i.e.* calls to advance the economic interest of the speaker and its audience.  *See Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995).

---

[4] Content-based regulations of speech are subject to the near-insurmountable standard of strict scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).  Strict scrutiny requires a law to be "narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

The crux of the parties' disagreement turns on whether *Reed* and *Barr* altered the traditional standard for analyzing commercial speech.  Defendant interprets *Reed* and *Barr* to broaden the umbrella of what constitutes content-based regulations; content-based regulations would include any restriction of speech that "draws distinctions based on the message a speaker conveys."  Mot. at 21–22 (quoting *Reed*, 576 U.S. at 163).  Plaintiff, on the other hand, argues that neither *Reed* nor *Barr* addressed the commercial-speech exception to the general rule for content-based regulations.  Resp. at 16.  Plaintiff therefore concludes that *Reed* and *Barr* did nothing to upset the traditional approach of distinguishing between content-based restrictions and regulation of commercial speech.  *Id.* at 17.

Plaintiff has the better argument for two reasons.  First, looking at the *Reed* and *Barr* opinions themselves, Plaintiff is correct that the Supreme Court did not directly address the commercial speech standard relative to the content-based standard.  Accordingly, this Court cannot conclude that the Supreme Court intended to drastically alter the standard of commercial speech without explicitly saying so.  In fact, the Court in *Barr* specifically disclaimed any dramatic change to existing First Amendment jurisprudence.  140 S. Ct. at 2347 ("Our decision is not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity.").[5]

Second, Eleventh Circuit precedent since *Reed* has continued to apply intermediate scrutiny to commercial speech regulations.  *See, e.g.*, *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017); *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1246 (11th Cir. 2015).  Admittedly, in *Ocheesee Creamery LLC v. Putnam*, the Eleventh

---

[5]  Even more recently, the Supreme Court maintained its position that *Reed* did not upset existing First Amendment precedent.  *See City of Austin, Tex. v. Reagan Nat'l Advertising of Austin, LLC*, 142 S. Ct. 1464, 2022 WL 1177494, at *7 (S. Ct. Apr. 21, 2022).

Circuit acknowledged the potential confusion arising from the Supreme Court's decisions in *Sorrell* and *Reed*. *See* 851 F.3d 1228, 1235 n.7 (11th Cir. 2017). Nevertheless, the court pointed out that even if it concluded certain commercial speech was content-based or speaker-focused, the court would continue to apply the intermediate scrutiny standard to commercial speech. *Id.* (citing *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1306–17 (11th Cir. 2017)). This continued application of intermediate scrutiny—coupled with the recent clarification in *Barr* that traditional First Amendment principles remain intact, *see* 140 S. Ct. at 2348—persuade this Court that intermediate scrutiny remains the appropriate standard in this case.

To survive intermediate scrutiny, the law at issue must serve a substantial government interest. *Went for It*, 515 U.S. at 624. Here, Plaintiff identifies a substantial government interest that courts have consistently recognized: consumer protection and privacy. *E.g.*, *Barr*, 140 S. Ct. at 2348 (recognizing "the credibility of Congress's continuing interest in protecting consumer privacy); *Schaevitz v. Braman Hyundai, Inc.*, 437 F. Supp. 3d 1237, 1253–54 (S.D. Fla. 2019) (concluding consumer privacy protection is a "compelling government interest"); *Wreyford v. Citizens for Transp. Mobility, Inc.*, 957 F. Supp. 2d 1378, 1380 (N.D. Ga. 2013) ("[T]he government has a significant interest in protecting users of cellular telephones from invasions of privacy, nuisance, and uninvited costs.").

Next, the Court must determine whether the autodialer provision directly and materially advances the public interest in consumer protection. *See Went for It*, 515 U.S. at 624. The Court concludes that it does: with the knowledge that autodialers greatly increase the speed and efficiency with which solicitors can connect to called parties, the Florida Legislature implemented limitations on the permissible use of autodialing equipment.

Finally, the autodialer provision must be narrowly drawn. *Id.* at 624. Significantly, "the 'least restrictive means' test has no role in the commercial speech context." *Id.* at 632 (citing *Bd.*

*of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).  Thus, a law need not represent the "single best disposition" to be narrowly tailored.  *Went for It*, 515 U.S. at 632.  The FTSA's autodialer provision is narrowly drawn because while limiting the use of autodialers, it does not outright prohibit them.  Nor does the autodialer provision prohibit unsolicited telephone calls. Rather, the FTSA leaves open the option of unsolicited live calls, consented-to autodialed calls, and unsolicited mail and email advertisements.  By leaving these alternative options of communication open, the autodialer provision is sufficiently narrow to pass intermediate scrutiny. In other words, the legislature's means fit the end sought.  *See id.* at 632.

In sum, the FTSA's autodialer provision does not represent an unconstitutional restriction on Defendant's commercial speech.  The FTSA's autodialer provision is narrowly drawn to advance a substantial government interest.  Defendant's First Amendment challenge therefore fails.

### 5. *The Autodialer Provision of the FTSA is not unconstitutionally vague.*

Defendant's fifth argument against Plaintiff's FTSA claim is that the autodialer provision of the FTSA "facially violates the Fifth Amendment Due Process Clause in its expansive vagueness."  Mot. at 23.  Defendant's vagueness argument piggybacks on its theory that the *Duguid* decision must bind this Court's interpretation of the FTSA—"[u]nmoored from *Duguid*," the FTSA's autodialer provision would have "a chilling effect on commercial speech by functionally discouraging all sales calls."  *Id.*  According to Defendant, the FTSA so broadly uses the term "automated system" that the statute fails to give fair notice of what is prohibited, thus inviting arbitrary enforcement by courts.  *Id.*

Because Defendant brings a facial challenge against the autodialer provision, Defendant "must establish that no set of circumstances exists under which the Act would be valid."  *Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1329 (11th Cir. 2001) (quoting *United States v.*

*Salerno*, 481 U.S. 739, 745 (1987)).  This is a heavy burden, which makes facial attacks "the most difficult challenge to mount successfully."  *Horton*, 272 F.3d at 1329.  When analyzing a facial challenge, the court should "examine the complainant's conduct before analyzing other hypothetical applications of the law."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).  If the statute clearly covers the conduct in which a party engages, the party cannot complain of the statute's vagueness.  *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1139–40 (11th Cir. 2014).

The FTSA's autodialer provision prohibits making calls that "involve[] an automated system for the selection or dialing of telephone numbers . . . without prior express written consent of the called party."  Fla. Stat. § 501.059(8)(a).  Plaintiff alleges Defendant sent the text messages at issue via a "computer software system that automatically selected and dialed Plaintiff's telephone number.  Second Am. Compl. ¶ 21.  Because the Court must accept Plaintiff's allegations as true, this allegation alone is sufficient to place Defendant's conduct within the confines of what the autodialer provision prohibits.  But Plaintiff includes additional factual allegations supporting the plausibility that Defendant's conduct is covered by the autodialer provision, including an allegation that Defendant itself characterized the text message software as an "automated system."  *See id.* ¶¶ 22–30.  These allegations, taken as true, place Defendant's conduct squarely within the scope of the autodialer provision. As a result, Defendant's facial challenge cannot stand.  *See Ala. Educ. Ass'n*, 746 F.3d at 1139–40.

Defendant counters that neither Plaintiff nor the statute explain what "an automated system" is.  *See* Reply at 13.  But it is well-settled under federal and Florida law that a legislature is "not required to define each and every word in a piece of legislation to express clearly its will." *Catalyst Pharm., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021); *State v. Brake*, 796 So. 2d 522, 528 (Fla. 2001) ("[T]he legislature's failure to define a statutory term does not in and of itself

render a penal provision unconstitutionally vague."). And in any event, Defendant clearly understands what an "automated system" is considering Defendant used that phrase to describe its text messaging software. *See* Second Am. Compl. ¶ 30.

Quite simply, Defendant cannot now complain that the FTSA's autodialer provision is unconstitutionally vague when (i) the statute clearly covers Defendant's alleged conduct and (ii) Defendant uses "automated system"—the very term about which it complains—to describe its text messaging software to the public.[6] Defendant's vagueness argument thus fails.

### 6. The FTSA's Autodialer Provision should not be construed as coextensive with the FTSA.

Rounding out Defendant's arguments regarding Plaintiff's FTSA claim is Defendant's position that the FTSA's autodialer provision should be "construed as coextensive with the TCPA's autodialer definition based on Constitutional Avoidance." Mot. at 25. The doctrine of Constitutional Avoidance "comes into play only when, after the application of ordinary textual analysis," a statute is susceptible to more than one construction. *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Assuming more than one construction is possible, the doctrine "functions as a means of choosing between them": "when deciding which of two plausible statutory constructions to adopt, . . . if one of them would raise a multitude of constitutional problems, the other should prevail . . . ." *Id.* at 380–81, 385 (emphasis omitted). Constitutional avoidance is "a means of giving effect to congressional intent, not subverting it." *Id.* at 382.

---

[6] Defendant claims that *Duguid* precludes the FTSA's use of "automated system" to include all equipment that automatically selects or dials telephone numbers. *See* Reply at 12. Certainly, in *Duguid*, the Supreme Court "decline[d] to interpret the TCPA as requiring such a difficult line-drawing exercise around how much automation is too much." 141 S. Ct. at 1171 n.6. However, as discussed above, the TCPA's autodialer provision—which was the focus of the Court's opinion in *Duguid*—is defined much more explicitly and restrictively than the FTSA's autodialer provision. *See supra* Part B.1. In other words, while the Supreme Court interpreted the TCPA as more of a scalpel than a chainsaw, *see* 141 S. Ct. at 1171, the same is not necessarily true for this Court's interpretation of the FTSA.

The doctrine of Constitutional Avoidance is not implicated in this case.  First, the Court disagrees with Defendant that the statute is subject to more than one construction.  Although Defendant time and again claims that the FTSA's autodialer provision could encompass modern-day cellphones, the plain meaning of "automated" would not likely support such a conclusion.  *See Automated*, Merriam-Webster, tinyurl.com/2zu8h8mb (last visited May 18, 2022) (defining "automated" as "operated automatically" and defining "automatically" as "having a self-acting or self-regulating mechanism").  The typical cellphone does not have a self-acting mechanism "for the selection or dialing of telephone numbers."  *See* Fla. Stat. § 501.059(8)(a).[7]

Second, even if the autodialer provision was subject to more than one construction, the construction for which Plaintiff advocates does not "raise a multitude of constitutional problems." *See Clark*, 543 U.S. at 385.  Although Defendant attempts to invalidate the autodialer provision through various constitutional arguments, the Court's analysis above illustrates that Plaintiff's interpretation of the autodialer provision would not offend any constitutional principles.  Thus, the doctrine of Constitutional Avoidance does not weigh in favor of adopting Defendant's proposed interpretation of the FTSA, nor does the doctrine warrant dismissal of Plaintiff's FTSA claim.

## CONCLUSION

In sum, the Court agrees with Defendant that the TCPA did not congressionally authorize the FCC to create a private right of action for individuals who have registered their cellphone numbers on the DNC Registry.  Nevertheless, this Court is without authority to refuse to enforce the FCC's 2003 Order, so Plaintiff's TCPA claim must be allowed to proceed.  *See Correll v.*

---

[7]  The Court notes that neither party claims Defendant used a cellular telephone to send the text messages at issue.  As such, Defendant's concern that the FTSA might punish regular use of cellular telephones is not best addressed through the facts alleged in this case.

*Iconic Mortg. Corp.*, No. 20-24858, 2021 WL 5014122, at *4–5 (S.D. Fla. Feb. 8, 2021) (enforcing the 2003 Order notwithstanding arguments that it exceeded the FCC's rulemaking authority).

As to Plaintiff's FTSA claim, however, the Court disagrees with Defendant on each argument lodged. Thus, Plaintiff's FTSA claim must also be allowed to proceed.

The Motion [ECF No. 24] is hereby **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 18th day of May, 2022.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**